**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>UNICO MARINE SERVICES, LLC,<br><br>Defendant. | ) | CIVIL ACTION NO. 24-8841 |

**COMPLAINT**

Plaintiff, the United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the United States Coast Guard, files this Complaint against Unico Marine Services, LLC ("Defendant" or "Unico Marine") and alleges as follows:

**NATURE OF THE ACTION**

1. On September 1, 2021, Unico Marine's commercial tank barge, the *Acadia*, and its articulated towing vessel, the *Teresa* (together, the "articulated vessels"), set sail from the Port of Bayonne, New Jersey, for Curacao. The articulated vessels were not prepared for the journey.

2. Unico Marine had cut corners to cut costs. To keep the articulated vessels working as much as possible, Unico Marine deferred maintenance and shirked proper management of the vessels. When they shoved off, the certificate of inspection ("COI") for the *Acadia* was invalid. The *Teresa*'s oily water separator ("OWS") was inoperable, packaging had been stuffed around a leaking rudder post, and its slop tank and steering room bilges were full and had not been vacuumed out.

3. Worse still, the National Weather Service had warned mariners of gusty winds, high waves, and lightning strikes as the remnants of Tropical Storm Ida passed through the area. Boaters were advised to seek safe harbor immediately until the storm passed.

4. With bilges full, rudder posts leaking, and an OWS in disrepair on the *Teresa*, the articulated vessels set sail with an outdated weather forecast and a crew of eight—a sailor short of safe staffing.

5. About 10.41 nautical miles off the coast of Atlantic City, the *Teresa* began taking on water through the rudder posts and through check valves located in the engine room, but there was nowhere to transfer the incoming water because the slop tank and bilges were full.

6. After trying and failing to manage the water ingress with portable pumps, the crew of the *Teresa* discharged oily water overboard to maintain stability, discharging roughly 10,000 gallons of oily bilge water directly overboard.

7. This is a civil action brought by the United States against the Defendant seeking civil penalties for multiple violations of Section 311 of the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1321. The Complaint addresses the Defendant's willful or grossly negligent discharge of oily bilge water from the *Teresa* into waters of the United States and its related violations of the Coast Guard's pollution control regulations.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action and the parties to this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 311(b)(7)(E), (e), and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E), (e), (n).

9. Authority to bring this action is vested in the United States Department of Justice by 28 U.S.C. §§ 516 and 519, and Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

10. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1395(a), and Section 311(b)(7)(E), (e), and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E), (e), (n), because the violations herein are alleged to have occurred in this judicial district and the Defendant does business in this district.

**THE DEFENDANT**

11. The Defendant is a Texas limited liability company. At the time of the violations alleged herein, the Defendant owned and operated the commercial tank barge, the *Acadia* (vessel number 1049252), and the articulated towing vessel, the *Teresa* (vessel number 1056534). At all times relevant to this Complaint, the Defendant owned and operated the articulated vessels, which were U.S.-flagged at the time of the violations alleged herein.

12. The Defendant is a "person" within the meaning of Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7).

**GENERAL FACTUAL ALLEGATIONS**

13. The Defendant purchased the articulated vessels from Penn Maritime, Inc., on or about February 25, 2021.

14. The *Acadia* is a cargo vessel that measures approximately 430 feet long and is approximately 9,451 gross tons.

15. The *Teresa* is a 656 gross-ton towing vessel that measures approximately 121 feet long.

16. On April 19, 2017, the Coast Guard issued a COI to Penn Maritime, Inc., for the *Acadia*, with an expiration date of April 19, 2022.

17. On July 20, 2020, the *Acadia*'s COI became invalid due to its failure to complete a periodic inspection within three months before or after the second or third anniversary of the vessel's COI. On July 21, 2020, the Coast Guard issued a CG-835 form, which restricted the

vessel from carrying cargo or conducting cargo operations.

18. The Defendant failed to contact the Coast Guard and apply for a COI after it issued the CG-835 form on July 21, 2020, to seek re-entry of commercial service to resume cargo operations.

19. On May 24, 2021, a Towing Safety Management System ("TSMS") certificate was issued for the *Teresa*, which expires on May 23, 2026.

20. On June 23, 2021, the *Acadia* sailed to St. Rose, Louisiana to pick up asphalt.

21. On June 29, 2021, the *Acadia* sailed from St. Rose, Louisiana to Bayonne, New Jersey to discharge asphalt.

22. On August 7, 2021, the *Acadia* sailed to St. Rose, Louisiana to pick up asphalt.

23. On August 17, 2021, the *Acadia* sailed from St. Rose, Louisiana to Perth Amboy, New Jersey to discharge asphalt.

24. On August 23, 2016, the Coast Guard issued an International Oil Pollution Prevention ("IOPP") certificate to the *Acadia*, which expired on August 23, 2021.

25. The IOPP for the *Acadia* became invalid on November 21, 2020, as the result of the Defendant's failure to obtain an annual survey within a year and three months of the anniversary date of August 23, 2020.

26. On December 22, 2017, the American Bureau of Shipping ("ABS") issued an IOPP certificate for the *Teresa* under the authority of the United States Government, which expired on April 19, 2022.

27. The IOPP for the *Teresa* became invalid on July 18, 2021, as the result of the Defendant's failure to obtain an annual survey within a year and three months of the anniversary date of April 19, 2021.

28. The date of the last intermediate survey under the IOPP certificate for the *Teresa* was on April 23, 2020, before the Defendant purchased the vessel.

29. The Form A Supplement to the IOPP certificate for the *Teresa* states that the means of retention and disposal of oily residues (sludge) and bilge water holding tank(s) was to pump ashore through fixed piping.

30. Fuel oil and lube oil leaked from machinery and piping into the engine room bilge of the *Teresa*.

31. On August 31, 2021, the *Teresa* took on approximately 56,900 gallons of diesel fuel.

32. On or before September 1, 2021, packing had been placed around a leaking rudder post on the *Teresa* as a temporary measure to try to prevent water ingress.

33. On or before September 1, 2021, and prior to departure to Curacao, crew members of the *Teresa* notified the Defendant that the vessel's slop tank and engine room bilges were full and that they needed to be vacuumed out, but the Defendant directed them to wait until they arrived in Curacao.

34. On September 1, 2021, at 7:08 am, the National Weather Service in New York, NY, issued a Marine Weather Statement stating that Doppler radar indicated a strong thunderstorm and that mariners could expect gusty winds to around 30 knots, locally higher waves, and lighting strikes. It also stated that the remnants of Ida as a post-tropical low would approach the waters that day and that boaters should seek safe harbor immediately until the storm passed.

35. On or before September 1, 2021, the Chief Mate generated a voyage plan for the *Teresa's* trip to Curacao using an expired weather forecast. This plan was required to be reviewed by both the Master of the vessel and the Defendant, but only the Chief Mate of the vessel signed this voyage plan, and it did not include the Coast Guard-required signatures from the Master of the

*Teresa* and the Defendant.

36. On September 1, 2021, at 10:10 a.m., the articulated vessels departed the Port of Bayonne, New Jersey, with Curacao as the intended destination.

37. On September 1, 2021, at 10:18 a.m., the National Weather Service in New York, NY, issued a Special Marine Warning, identifying thunderstorms capable of producing waterspouts and wind gusts of 34 knots or greater.

38. On September 1, 2021, the *Teresa* embarked on a voyage to Curacao with eight crew members, which was one below safe manning.

39. On September 1, 2021, the *Acadia* was not loaded with cargo, but it contained asphalt bottoms in its tanks from past cargo.

40. The *Teresa* is equipped with an OWS, but it was inoperable on September 1, 2021.

41. On the night of September 1, 2021, and continuing into the early morning hours of September 2, 2021, around 10.4 nautical miles off the coast of Atlantic City, the *Teresa* began taking on water through the rudder posts and through check valves located in the engine room, but there was nowhere to transfer the incoming water onboard because the slop tank and bilges were full.

42. Starting on September 1, 2021, the crew of the *Teresa* used portable pumps to move water from the starboard bilge to the port bilge. The pumps could not keep up with the water ingress, which contributed to a lack of steering response.

43. On September 1, 2021, the Chief Engineer notified the Captain of the *Teresa* that he believed they needed to conduct a discharge of oily water overboard for the vessel to maintain stability, although he stated that he did not believe that the vessel was at risk of capsizing or sinking.

44. Starting on September 1, 2021, the crew of the *Teresa* used a pump to discharge approximately 10,000 gallons of oily bilge water directly overboard into the Atlantic Ocean.

45. On September 2, 2021, the crew of the *Teresa* aborted the voyage and the articulated vessels turned around and traveled to the New York City Harbor.

46. The crew on the *Teresa* did not make a distress call to the Coast Guard.

47. Upon arrival of the *Teresa* to New York City, on September 2, 2021, an ABS surveyor boarded the vessel and documented the leaking rudder post, among other things. ABS recommended temporary in-water repairs to remove the old rubber packing and greasing of the sealing surfaces to reduce the water leakage rate to permit one-way transit to a repair facility for full rudder system inspection and repairs. The ABS surveyor also found that the bilges and slop tanks of the *Teresa* were full and not emptied prior to the vessel departure to Curacao.

48. On September 2, 2021, the Coast Guard issued a second CG-835 form, which restricted the *Teresa* from moving until ABS could attest to the vessel's watertight integrity.

49. On or about September 7, 2021, the Defendant reflagged the articulated vessels from the United States to Liberia.

50. On or about October 21, 2021, Liberia conducted a flag state inspection of the *Teresa* in New York and issued violations, including for leaking rudder posts and excessive oil in the bilges. The vessel was then detained and forced to dry dock in the United States for repair.

51. At all times relevant to this Complaint, the Defendant knew that the *Teresa* was unable to retain on board all its oily mixtures generated while underway, which contributed to the discharge of oily bilge water overboard into the Atlantic Ocean that started on September 1, 2021.

52. The Defendant operated the *Teresa* without adequate capacity to retain all its oily

mixtures on board, which contributed to the discharge of oily mixtures into the Atlantic Ocean starting on September 1, 2021.

53. The Defendant failed to store oily mixtures on board the *Teresa* until it returned to port.

54. The Defendant failed to filter the oil from the water using an OWS before discharging it overboard the *Teresa.*

55. The Defendant sold the articulated vessels on or about March 30, 2022, which was approved by the court in *Glander International Bunkering Inc. v. M/V TERESA*, 586 F. Supp. 3d 189 (E.D.N.Y. 2022).

56. At all times pertinent to this action, the Defendant was the owner and operator of the articulated vessels.

57. The Defendant had the responsibility and authority to prevent or promptly correct the violations alleged in this Complaint but failed to take action to do so.

58. The natural resources present in the area where the oily water discharge occurred include multiple kinds of fish (Giant manta ray, oceanic whitetip shark, and Atlantic sturgeon), sea turtles (Loggerhead turtles, leatherback turtles), marine mammals (Fin whales, North Atlantic Right whales, humpback whales, Bottlenose dolphins, and Atlantic spotted dolphins), seabirds (northern gannet, Wilson's storm-petrel, gulls, terns, phalaropes, shearwaters, and scoters), and biota belonging to, appertaining to, or under the United States' exclusive management authority.

59. Spilled oil can harm living things because its chemical constituents are poisonous. This can affect organisms both from internal exposure to oil through ingestion or inhalation and from external exposure through skin and eye irritation. Oil can also smother some small species of fish or invertebrates and coat feathers and fur, reducing birds' and mammals' ability to maintain their body temperatures.

60. The full extent of injuries to the people and the environment from the oil spill has not yet been determined.

## STATUTORY AND REGULATORY BACKGROUND

### A. CLEAN WATER ACT (CWA)

61. The objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. Section 101(a) of the CWA, 33 U.S.C. § 1251(a).

62. Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits, inter alia, the "discharge of oil . . . into or upon the navigable waters of the United States, adjoining shorelines, or into waters of the contiguous zone . . . or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act), in such quantities as may be harmful . . . ." *Id.*

63. In Section 311(b)(4) of the CWA, Congress directed the President to determine by regulation "those quantities of oil and any hazardous substance the discharge of which may be harmful to public health or welfare or the environment of the United States." *Id.* § 1321(b)(4). The President delegated authority to the Administrator of the Environmental Protection Agency ("EPA") under CWA § 311(b)(3) and (b)(4) for determining quantities of oil the discharge of which may be harmful. Exec. Order No. 12777, 56 Fed. Reg. 54757, 54768 (1991). The EPA determined that discharges of oil that "violate applicable water quality standards, or cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines" are, for purposes of Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4), discharges of oil in such quantities that may be harmful to the public health or welfare or the

environment of the United States. 40 C.F.R. § 110.3.

64. Under Section 311(b)(7)(A), "[a]ny person who is the owner, operator, or person in charge of any vessel . . . from which oil . . . is discharged in violation of paragraph (3), shall be subject to a civil penalty . . . ." 33 U.S.C. § 1321(b)(7)((A). Pursuant to the strict liability standard of Section 311(b)(7)(A), violation of Section 311(b)(3) subjects a person to a civil penalty of up to $55,808 per day of violation or up to $2,233 per barrel of oil discharged. *Id*. § 1321(b)(7)(A) and (D); *see also* 33 C.F.R. § 27.3. Civil penalties can be increased to a minimum of $223,229 and up to $6,696 per barrel discharged under Section 311(b)(7)(D) if it is proved that the violation is the result of "gross negligence or willful misconduct." *Id*.

65. Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7), defines "person" as an owner or operator of the vessel from which oil was discharged.

66. Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), defines "owner or operator" to include the owner and operator of a vessel.

67. Section 311(a)(3) of the CWA, 33 U.S.C. §1321(a)(3), defines "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel."

68. Section 311(a)(2) of the CWA, 33 U.S.C. §1321(a)(2), defines "discharge" to include "any spilling, leaking, pumping, pouring, emitting, emptying or dumping" subject to certain specified exceptions not at issue here.

69. Section 311(a)(1) of the CWA, 33 U.S.C. §1321(a)(1), defines "oil" to mean "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil."

70. Pursuant to 33 C.F.R. § 151.05, "[a]ny liquid entering the bilge system . . . is considered

oily bilge water."

71. Because fuel oil and lube oil routinely leak from machinery and piping into a vessel's engine room bilge, "[a]ny liquid entering the bilge system including bilge wells, bilge piping, tank top or bilge holding tanks is considered oily bilge water." *Id*. In addition to oil leaks, sea water and other waste fluids also enter the bilge and commingle with the oil to form an oily mixture, which includes slops from bilges. *Id*.

72. The Coast Guard has promulgated pollution control regulations under the authority of Section 311(j) of the CWA, 33 U.S.C. § 1321(j), including 33 C.F.R. § 155.360. Pursuant to 33 C.F.R. § 155.360, no person may operate an oceangoing ship of 400 gross tons and above but less than 10,000 gross tons, unless: it is fitted with approved 15 parts per million OWS equipment for the processing oily mixtures from bilges or fuel tank ballast.

73. Even with an OWS, the discharge must be less than 15 parts per million oil (without dilution), pursuant to 33 C.F.R. § 151.10.

74. Pursuant to 40 C.F.R. § 110.3, quantities of oil that may be harmful include quantities that "[c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."

75. Pursuant to 33 U.S.C. §1321(b)(3), discharges into the territorial seas and waters of the contiguous zone or where discharges "which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States," are prohibited.

76. Pursuant to 33 C.F.R. § 151.19(a) and (e)(2), each U.S. oil tanker of 150 gross tons and above and other U.S. ships of 400 gross tons and above that engage in voyages to port under the

jurisdiction of other parties to the International Convention for the Prevention of Pollution from Ships ("MARPOL") must have onboard a valid IOPP certificate. A certificate ceases to be valid if annual and intermediate surveys as required by 33 C.F.R. § 151.17 are not carried out.

77. Pursuant to 46 C.F.R. § 31.05-1(a), a vessel must obtain a COI prior to operation. To maintain a valid COI, the vessel must undergo an annual inspection within three months before or after each anniversary date and undergo periodic inspections within three months before or after the second or third anniversary of the date of the vessel's COI, and the COI must be endorsed. *Id*. § 31.10-17(a), (b).

78. When a vessel is not underway, it does not leave commercial service and then reenter when it gets back underway. Rather, the vessel remains in commercial service even when not actively operating. A vessel would not be considered inactive if it carried oil as a cargo or cargo residue, 33 C.F.R. § 155.5020, which includes asphalt. U.S. Coast Guard and U.S. Dep't of Homeland Sec., *Appendix B. Glossary Terms, Guidelines for the U.S. Coast Guard Oil Spill Removal Organization Classification Program* 62 (2021).

79. 33 C.F.R. §§ 151.19(a), (e)(2), and 155.360, were promulgated under the authority of CWA Section 311(j), 33 U.S.C. § 1321(j), and therefore violations are subject to daily civil judicial penalties under Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C).

80. Any person who fails or refuses to comply with any regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j), shall be subject to a civil penalty of up to $55,808 per day for each violation pursuant to Section 311(b)(7)(C), 33 U.S.C. § 1321(b)(7)(C); *see also* 33 C.F.R. § 27.3 (presenting the Coast Guard's 2023 inflation-adjusted penalty amounts).

**FIRST CLAIM FOR RELIEF**
**(Unlawful Discharge of Oil into Waters of the United States)**

81. Paragraphs 1 through 80 are realleged and incorporated herein.

82. Enforcement of Section 311 of the CWA supports the national objective to prevent and deter oil spills and "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251(a), 1321(b)(1).

83. The Defendant is a "person" within the meaning of Section 311(a)(7) of the CWA. *Id*. § 1321(a)(7).

84. The Defendant was the owner and operator of the vessel from which oil was discharged within the meaning of Section 311(a)(6) of the CWA. *Id*. § 1321(a)(6).

85. The *Teresa* is a "vessel" within the meaning of Section 311(a)(3) of the CWA. *Id*. § 1321(a)(3).

86. The pumping of oily bilge water overboard from the *Teresa* starting on September 1, 2021, constitutes a "discharge" of oil within the meaning of CWA Section 311(a)(2). *Id*. § 1321(a)(2).

87. The discharge contained "oil" within the meaning of Section 311(a)(1) of the CWA. *Id*. § 1321(a)(1).

88. The Defendant discharged oil from the *Teresa* into the territorial sea, the Atlantic Ocean, offshore of New Jersey.

89. The Defendant discharged oil from the *Teresa* while traveling through the habitat of numerous types of natural resources. The oil discharges may have affected natural resources, including water, fish, marine mammals, sharks, birds, and biota, belonging to, appertaining to, or under the United States' exclusive management authority. Discharging oil into and upon waters that these species inhabit is known to cause them harm.

90. The oil discharge was in a quantity "as may be harmful" within the meaning of Section

311(b)(3) and (4) of the CWA, 33 U.S.C. § 1321(b)(3)-(4), and 40 C.F.R. § 110.3.

91. The oil discharge violated Section 311(b)(3) of the CWA. 33 U.S.C. § 1321(b)(3).

92. The Defendant knew discharging oily mixtures overboard was unlawful and knew the *Teresa's* oily waste generation rate exceeded its capacity to retain the waste onboard during its planned commercial voyage. Instead of legally managing the waste stream and operating within the limits of the vessel, the Defendant discharged oil while at sea. Discharging oil overboard during a commercial voyage enabled the articulated vessels to stay at sea longer to pick up and deliver asphalt, thereby increasing profits, and it allowed the Defendant to avoid the costs of proper waste management and disposal. The oil discharge starting on September 1, 2021, was the result of the Defendant's gross negligence or willful misconduct, including the failure to maintain the vessel and the pumping of oily bilge waste overboard.

93. The Defendant is liable for civil penalties of up to $55,808 per day for each violation or up to $2,233 per barrel discharged under CWA Section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), or under Section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(A), if it is proved that the violations are the result of gross negligence or willful misconduct, a minimum of $223,229 and up to $6,696 per barrel discharged. *See* 33 C.F.R. § 27.3 (presenting the Coast Guard's 2023 inflation-adjusted penalty amounts).

**<u>SECOND CLAIM FOR RELIEF</u>**
**(Failure to Maintain Capacity to Retain Oily Mixtures Onboard)**

94. Paragraphs 1 through 80 are realleged and incorporated herein.

95. At all times relevant to this Complaint, the *Teresa* was a 656-ton U.S.-flagged towing vessel.

96. The Defendant operated the *Teresa* during the voyage starting on September 1, 2021,

without the capacity to retain on board the oily mixtures generated by the vessel. The *Teresa* had an OWS on board, but it was inoperable on the day of the discharge, which began on September 1, 2021, in violation of 33 C.F.R. § 155.360, promulgated under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

97. The Defendant is liable for civil penalties of up to $55,808 per day for each violation under Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C). *See* 33 C.F.R. § 27.3.

**<u>THIRD CLAIM FOR RELIEF</u>**
**(Operation Without a Valid COI)**

98. Paragraphs 1 through 80 are realleged and incorporated herein.

99. Pursuant to 46 C.F.R. § 31.05-1(a), promulgated under Section 311(j) of the CWA, 33 U.S.C. § 1321(j), when a tank vessel is found to comply with all applicable regulations, the Coast Guard will issue a COI to the vessel or to its owners.

100. The *Acadia* is a tank vessel.

101. On April 19, 2017, the Coast Guard issued a COI for the *Acadia* to Penn Maritime, Inc.

102. On July 20, 2020, the *Acadia's* COI became invalid due to its failure to complete a periodic inspection within three months before or after the second or third anniversary of the issuing date of the vessel's COI on April 19, 2017.

103. On July 21, 2020, the Coast Guard issued a CG-835 form, which restricted the vessel from carrying cargo or conducting cargo operations. The Defendant failed to contact the Coast Guard and apply for a COI after the Coast Guard issued the CG-835 form on July 21, 2020, to seek re-entry of commercial service to resume cargo operations.

104. The Defendant commenced commercial operations of the *Acadia* without a valid

COI on at least five occasions: June 23, 2021, June 29, 2021, August 7, 2021, August 17, 2021, and the date of the oil discharge that started on September 1, 2021.

105. The Defendant is liable for civil penalties of up to $55,808 per day for each violation under Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C). *See* 33 C.F.R. § 27.3.

**FOURTH CLAIM FOR RELIEF**
**(Operation Without Required Survey Inspections)**

106. Paragraphs 1 through 80 are realleged and incorporated herein.

107. Pursuant to 33 C.F.R. § 151.19(a) and (e)(2), promulgated under Section 311(j) of the CWA, 33 U.S.C. § 1321(j), each U.S. oil tanker of 150 gross tons and above and other U.S. ships of 400 gross tons and above that engage in voyages to port under the jurisdiction of other parties to MARPOL must have onboard a valid IOPP certificate. A certificate ceases to be valid if annual surveys as required by 33 C.F.R. § 151.17 are not carried out.

108. At all times relevant to this Complaint, the *Acadia* was a U.S.-flagged vessel with a gross tonnage volume and weight above 400 gross tons.

109. On August 23, 2016, the Coast Guard issued an IOPP certificate to the *Acadia*.

110. The IOPP for the *Acadia* became invalid on November 21, 2020, as the result of the failure to conduct an annual survey within a year and three months of the anniversary date on August 23, 2020.

111. At all times relevant to the Complaint, the *Teresa* was a U.S.-flagged vessel with a gross tonnage volume and weight above 400 gross tons.

112. On December 22, 2017, an IOPP certificate was issued for the *Teresa* with an expiration date of April 19, 2022.

113. The IOPP for the *Teresa* became invalid on July 18, 2021, as the result of the failure to conduct an annual survey within a year and three months of the anniversary date of April 19, 2021.

114. The articulated vessels were U.S. flagged at the time of the unauthorized oily water discharge and engaged in an international voyage to port in Curacao that was a party to MARPOL without completing the annual surveys required by their IOPP certificates, in violation of 33 C.F.R. § 151.19(a) and (e)(2).

115. The Defendant is liable for civil penalties of up to $55,808 per day for each violation under Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C). *See* 33 C.F.R. § 27.3.

**PRAYER FOR RELIEF**

WHEREFORE, based upon all the allegations set forth above, the United States respectfully requests that this Court grant the following relief:

A. Enter judgment against the Defendant and in favor of the United States;

B. Assess civil penalties against the Defendant for the oil discharge violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), in the amount of up to $55,808 per day of violation or up to $2,233 per barrel discharged under CWA Section 311(b)(7)(A), or, if it is proved that the violations are the result of gross negligence or willful misconduct, in the amount of at least $223,229 per discharge and up to $6,696 per barrel discharged under Section 311(b)(7)(D);

C. Assess civil penalties against the Defendant of up to $55,808 per day for each violation of the Coast Guard's pollution control regulations promulgated pursuant to Section 311(j) of the

CWA, 33 U.S.C. § 1321(j), as authorized under CWA Section 311(b)(7)(C), 33 U.S.C. § 1321(b)(7)(C); and

D. Grant such other relief as this Court may deem just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
_s/ Alison Kelly_
ALISON KELLY
Trial Attorney
Florida Bar No.: 00016660
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Ben Franklin Station P.O. Box 7611
Washington D.C. 20044-7611
(202) 514-1210
Alison.Kelly@usdoj.gov

PHILIP R. SELLINGER
United States Attorney

_s/ Alex Silagi_
ALEX SILAGI
Assistant United States Attorney
New Jersey Bar No.: 123352015
United States Attorney's Office
District of New Jersey
970 Broad Street, Ste. 700
Newark, NJ 07102
(973) 353-6001
Alex.Silagi@usdoj.gov